**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7                   UNITED STATES DISTRICT COURT
8                   NORTHERN DISTRICT OF CALIFORNIA
9
10
DANIEL IMPEY,
11
            Plaintiff,                    No. C-09-01973 EDL
12
                                          **ORDER DENYING MOTION FOR SUMMARY**
     v.                                   **JUDGMENT; GRANTING MOTION TO**
13                                        **COMPEL MEDICAL EXAMINATION**
14   THE OFFICE DEPOT, INC.
15                   Defendant.
16   _____/
17
18        Defendant Office Depot, Inc. has filed a motion for summary judgment of Plaintiff Daniel
19   Impey's claims for employment discrimination, failure to prevent discrimination, and wrongful
20   termination.  Office Depot contends that Plaintiff cannot make a prima facie showing of age,
21   disability, or perception of disability discrimination, and that even if he could, Mr. Impey was
22   terminated for legitimate, nondiscriminatory business reasons and there is no evidence of pretext.  For
23   the following reasons, the Court DENIES Office Depot's Motion for Summary Judgment.  The Court
24   GRANTS Office Depot's Motion to Compel Plaintiff to Submit to an independent medical
25   examination by Office Depot's Rebuttal Expert.
26
27
28

**United States District Court**
For the Northern District of California

1    **I.      Factual Background**

2            **A.      Mr. Impey's Experience at Office Depot**

3            Plaintiff Daniel Impey was hired by Office Depot as an Assistant Store Manager in a San Jose

4    store in December 1997 when he was approximately 44 years old.  Compl. ¶ 7; Declaration of Daniel

5    Impey in Support of Opposition to Motion for Summary Judgment ("Impey Decl.") ¶¶  2, 11.  In

6    April 1998, Plaintiff was injured in a car accident and took a leave of absence for several months.

7    Fukunaga Decl. Ex. A (Impey Depo.) at 102-103.  In July 2001, Plaintiff was promoted to the

8    position of Store Manager.  Impey Decl. ¶ 3.  Thereafter, at his request he was transferred to the

9    Dublin store, a store of higher volume and square footage than his previous assignment.  Impey Decl.

10   ¶ 4.  In 2004, Plaintiff took a seven month leave of absence for neck surgery.  Fukunaga Decl. Ex. A

11   (Impey Depo.) at 104-105.

12          In 2005, an individual named Ms. Perry became Plaintiff's direct supervisor as the District

13   Manager for District 70, the district in which Plaintiff's store was located.  Sivarajah Decl Ex. B

14   (Perry Depo.) at 11.  Ms. Perry was 45 years old at the time she was hired in 2005.  Perry Decl. ¶ 2.

15   In April 2007, Plaintiff had back surgery and took an additional leave of absence of several months.

16   Fukunaga Decl. Ex. A (Impey Depo.) at 107-108.  Following Plaintiff's 2007 surgery, he was

17   restricted from lifting more than ten pounds or from twisting.  Id. at 111.  Plaintiff informed Ms.

18   Perry and Office Depot of his restrictions.  Office Depot never ignored a restriction that the company

19   was aware of, and Plaintiff  never performed any work outside of his restrictions during his

20   employment.  Fukunaga Decl. Ex. A (Impey Depo.) 106, 111, 137; Sivarajah Decl. Ex. B (Perry

21   Depo.) at 21, 147.  The back surgery caused Mr. Impey to lose weight, appear thinner and walk with

22   a slight limp.  Impey Decl. ¶ 8-9; Perry Depo. at 21 (he "appeared thinner"); see also Fukunaga Decl.

23   Ex. F (Yoshidome Depo.) at 134 (a subordinate mentioned something about Plaintiff's weight, but

24   deponent could not recall exactly what was said).  On at least one occasion following his return to

25   work, Ms. Perry referred to Plaintiff's lifting restrictions in the presence of other workers.  See

26   Sivarajah Decl. Ex. A (Impey Depo.) at 97-98, 111-13 (comments such as "just be careful about your

27   lifting" and "don't go outside of your lifting restrictions" made in what Plaintiff perceived to be a

28   snide manner).  Also on one occasion following his return to work, Ms. Perry required Plaintiff to

submit a doctor's note when he missed work due to the flu, a requirement that Plaintiff claims had not

1   been previously imposed on him.  Sivarajah Decl. Ex. A (Impey Depo.) at 37-38, 97; Impey Decl. ¶

2   10; Fukunaga Supp. Decl. Ex. L.

3          Another store manager in District 70, Karen Dewey, has a rare neurological disorder called

4   "stiff person syndrome" which triggers muscle stiffness and spasms and inhibits her ability to walk

5   and move.  Dewey Decl. ¶ 4.  Ms. Dewey has always felt that Ms. Perry was supportive of her and

6   encouraged her to take time off to deal with her condition.  Id. at ¶ 5.  Another store manager in

7   District 70, Ralph Stauffer, had a brain tumor during his employment with Office Depot while Ms.

8   Perry was his supervisor.  Fukunaga Decl. Ex. J (Stauffer Depo.) at 35.  Ms. Perry told him to do

9   what he had to do to take care of himself, and no one at Office Depot ever treated him unfairly

10  because of his condition.  Id. at 36, 153.

11         Mr. Impey was 55 years old at the time of his termination, making him the oldest store

12  manager in his district at the time.  Impey Decl. ¶ 11; Fukunaga Decl. Ex. I.  Additionally, he had

13  been with the company for 11 years, making him the store manager with the third longest tenure in

14  the district.  Id.  During his employment, on approximately two or three occasions, Ms. Perry referred

15  to Plaintiff and one or two other store managers (including Karen Dewey, and possibly Ralph

16  Stauffer) who had been with the company for a significant period of time as "old timers."  Sivarajah

17  Decl Ex. A (Impey Depo.) at 128-30.  Plaintiff interpreted this comment to refer to his age as

18  opposed to the length of his employment with the company, and mentioned to Ms. Perry that he felt

19  the comment was demeaning because he was "not that, you know, decrepit."  Id. at 129-31.  Ms.

20  Perry "blew off" Plaintiff's complaint and used the term on one other occasion, but Plaintiff did not

21  raise the issue with higher management.  Id.  Ms. Perry admits to having used the term "old timers"

22  on several occasions, but states that the reference pertained only to the fact that the individuals in

23  question "had been working for Office Depot for many years and that they were very experienced

24  store managers" and she "never intended that remark to refer to their ages" and did not have any

25  knowledge of how old they were.  Perry Decl. ¶ 5.  Another store manager, Ms. Dewey, who has

26  been employed by Office Depot for fifteen years and was 53 years old at the time of Mr. Impey's

27  termination (and therefore approximately two years younger than him), understood Ms. Perry's

28  reference to herself and Mr. Impey as "old timers" as referring to their long-term experience with the

company, and not to their ages.  Dewey Decl. ¶ 7.  Mr. Impey and Ms. Dewey sometimes referred to

3

**United States District Court**

For the Northern District of California

1  themselves as "old timers" and Ms. Dewey claims Mr. Impey never told her that he found Ms.

2  Perry's referral to him as an old-timer to be insulting or derogatory.  Id.; but see Impey Depo. at 130

3  (in reference to "old timer" comment, states that "I think Karen and I had a discussion about it.").

4  Another store manager in the district, Mr. Stauffer, was 43 at the time of Mr. Impey's termination,

5  and had been with Office Depot since 1994.  Fukunaga Decl. Ex. I.  Mr. Stauffer is unaware of

6  inappropriate comments by Ms. Perry about older people, or about anything.  Fukunaga Decl. Ex. J

7  (Stauffer Depo.) at 45-46.

8          While he was employed by Office Depot, Mr. Impey received performance evaluations

9  generally stating that he was meeting the expectations of his position and he received regular pay

10  raises and bonuses.  Sivarajah Decl. Ex. A-1, A-2.  However, in July 2008, Office Depot's loss

11  prevention department discovered that one of Mr. Impey's assistant store managers, M.F.,[1] had stolen

12  Mr. Impey's password to the store's timekeeping management system from a card under Plaintiff's

13  computer monitor and falsified his own as well as another employee's time records in violation of

14  company policy.  Coulombe Decl. ¶ 8, Ex. E (DEF00401); see also Lindo Decl. ¶ 6.  Mr. Impey had

15  no knowledge of M.F.'s actions until the company's investigation.  Impey Decl. ¶ 14; Sivarajah Decl.

16  Ex. E (Lindo Depo.) at 62.  M.F. admitted that he had stolen Mr. Impey's password and made the

17  edits, but contended that he made the changes to avoid "meal period penalties" as a result of

18  inadequate management coverage on the weekends.  Lindo Decl. ¶ 9, Sivarajah Decl. Ex. E (Lindo

19  Depo.) at 53-54; id. Ex. B (Perry Depo. at 34-35).   Specifically, to comply with meal and rest break

20  regulations, Office Depot's policies require employees to take a 30 minute break before the end of an

21  employee's fifth hour of work should the employee work more than six hours.  Coulombe Decl. ¶ 7,

22  Ex. D at DEF00389.  If the meal break is not taken or take after the fifth hour of work, then the

23  employee is paid for an additional hour of work.  Id. at ¶ 9, Ex. D. at DEF00392; see also Cal. Indus.

24  Welfare Comm'n Wage Order no. 7 (attached as Fukunaga Decl. Ex. B).  M.F. voluntarily resigned

25  his position as a result of this incident.  Coulombe Decl. ¶ 8, Ex. E (DEF00401); Lindo Decl. ¶ 9.  He

26  was 28 years old and not known to have any disabilities.  Coulombe Decl. ¶ 16; Impey Depo. at 137.

27

28

---

[1]Names of third party employees have been redacted where necessary to protect their identity.

4

1    As an additional result of the incident, Mr. Impey was placed on a performance improvement

2  process ("PIP") for failure to keep his password safe, and was warned that a recurrence of the

3  violation would result in termination.  Sivarajah Decl. Ex. A-5 at DEF000810.  He was also placed on

4  a PIP because "lack of oversight in the scheduling process led to inadequate management coverage to

5  ensure meal period compliance, especially on the weekends. By not verifying the processing of

6  payroll and manual edits Dan did not identify inappropriate practices taking place."  Sivarajah Decl.

7  Ex. A-5 at DEF00082.  He was warned that the consequence of a recurrence would be further

8  corrective action in the form of a final performance improvement program.  Id.  One of Plaintiff's

9  store managers who worked weekends testified that there was sufficient coverage on weekends for

10  employees to take their meal breaks.  Yoshidome Depo. at 57; see also Impey Decl. ¶ 16 ("Since the

11  time records that [M.F.] falsely edited showed that he was appropriately taking his meal breaks, I was

12  not aware of any problems with [M.F.] or any other manager not being able to take their lunch

13  breaks.").

14    Following M.F.'s departure, Mr. Impey had one remaining assistant store manager, Gin

15  Yoshidome.  Impey Decl. ¶ 18.  Mr. Impey asked Ms. Perry for additional assistance, but none was

16  forthcoming.  Impey Decl. ¶ 19.  Ms. Perry has explained that this was because the Dublin store did

17  not qualify for two assistant store managers because its volume had dropped off and it was "no longer

18  over the mark where [it was] to have two assistant managers."  Supp. Fukunaga Decl. Ex. N at 47-48,

19  see also Ex. O (Coulombe Depo.) at 59-60.

20    On September 30, 2008, Senior Human Resource Generalist Lori Hale was preparing to

21  perform a site assessment at Plaintiff's store.  Impey Depo. at 70.  Ms. Hale performed site

22  assessments in the Bay Area approximately every six months, and each Bay Area store was audited

23  from zero to two times per year.  Sivarajah Decl. Ex. F (Hale Depo.) at 98-99, 105-06.  As Ms. Hale

24  prepared for the site assessment, she reviewed the store's timekeeping management system and

25  noticed 15 meal period violations in a four-week period, as well as manual edits to the timecards of

26  three employees during the last two weeks of September.  Hale Decl. ¶ 3, 5, 6; Ex. B.  Specifically,

27  Mr. Impey edited assistant store manager Gin Yoshidome's time entry for Sunday, September 21,

28  2008 from his clock-in time of 7:06 a.m. to 10:00 a.m. and commented "Gin works Sunday.

Neglected to adjust schedule."  Impey Decl. Ex. C.  Mr. Impey adjusted Perla Darby's time entry for

United States District Court

For the Northern District of California

1    Thursday, September 18, 2008 from her clock-in time of 6:56 a.m. to 7:00 a.m. and commented

2    "Perla actually started at 7:00 a.m."  Impey Decl. Ex. A.  Mr. Impey adjusted Qayoum Wassie's time

3    entry for Sunday, September 21, 2008 from his clock-in time of 9:58 a.m. to 10:00 a.m. and

4    commented "Qayoum actually started at 10:00 a.m. Shift Ended 7:13 p.m."  Impey Decl. Ex. A.  Ms.

5    Hale looked at the time sheets in question to determine whether the edits were proper.  Sivarajah

6    Decl. Ex. F (Hale Depo.) at 150; Hale Decl. ¶ 5, Ex. B.

7         Office Depot's time keeping policy provides that: "Falsifying the hours of another associate

8    and/or falsification of one's own hours worked may result in disciplinary action up to and including

9    termination."  Coulombe Decl. Ex. A at 17, Ex. B at DEF00328.  The company's performance

10   improvement process policy lists various types of misconduct that Office Depot considers serious

11   enough to warrant "immediate termination without previous warning," including "falsifying

12   Company paperwork and/or documents."  Id. Ex. B at DEF00354.  Plaintiff received and read the

13   handbooks in which these policies are contained.  Impey Depo. at 53-55.  Additionally, Office Depot

14   policy holds store managers responsible for ensuring that associates are clocking in and out at

15   appropriate times (Coulombe Decl. ¶ 11, Ex. F atDEF01615), and it is undisputed that Mr. Impey

16   "constantly" instructed his employees to start their shifts at their scheduled start times (Sivarajah

17   Decl. Ex. D (Yoshidome Depo.) at 37-38).

18        On September 29, 2008, Ms. Hale sent an email to her supervisor, Human Resources Manager

19   Cheryl Coulombe, alerting her that she "found some concerning things while preparing for the Site

20   Review" the next day, and specifically referred to the number of meal period violations and the three

21   timecard edits, which she found "appear to have been done (by Dan) to avoid the meal period penalty

22   in the last two weeks."  Hale Decl. Ex. A. She states that her concerns arose because "the amount of

23   time that the in punch was changed made the meal period compliant."  Supp. Fukunaga Decl. Ex. P

24   (Hale Depo.) at 151.  For example, the report for Ms. Darby showed that she originally clocked in at

25   6:56 a.m., and punched out for lunch at 11:58 a.m. – five hours and two minutes later – which would

26   incur a meal period penalty.  Coulombe Decl. ¶ 9; Impey Decl. Ex. A.  Later that day, Mr. Impey

27   changed Ms. Darby's clock-in time to 7:00 a.m., making her compliant with the meal period policy.

28   Id.; see also Supp. Fukunaga Decl. Ex. P (Hale Depo.) at 152.  Ms. Hale's initial email does not

     specifically refer to the "explanation" contained in the comments section of the timecard entries for

**United States District Court**

For the Northern District of California

1   two of the individuals, Ms. Darby and Mr. Wassie, but states that the explanation for Mr. Yoshidome

2   "makes no sense."  Hale Decl. Ex. A.  Ms. Hale has also testified that she questioned Plaintiff's edits

3   because Office Depot's timekeeping management system allows employees to clock in up to five

4   minutes early, so there would be no reason to adjust these employees' start times other than to avoid

5   meal period penalties.  Fukunaga Decl. Ex. C (Hale Depo.) at 159-60; Coulombe Decl. ¶ 11.

6       On September 30, 2008, Ms. Hale conducted a site visit at Plaintiff's store and spoke to

7   Plaintiff, Mr. Wassie, Ms. Darby and Mr. Yoshidome.  Ms. Hale asked Plaintiff about Mr. Wassie

8   and Ms. Darby's timecard edits, and why he changed their times by two and four minutes

9   respectively.  During his deposition, Plaintiff stated that he may not have answered her question as

10  precisely as he should have at the time, and "can't recall if [he] said anything specifically to her."

11  Impey Depo. at 73-74; but see Impey Decl. ¶ 23 (stating that during Ms. Hale's site visit, he provided

12  her with "the same explanation that I had written in the comments section of the time sheets and

13  expressed to Ms. Hale that I always performed work with integrity and with the company's best

14  interest in mind").  He also stated that he did not tell any other member of management why he

15  changed these time entries (other than including an explanation in the comments section of the time

16  management system at the time of the changes), though he was not prevented from doing so.  Impey

17  Depo. at 74, 83.  Ms. Hale also met with: (1) Ms. Darby, who was not aware that Plaintiff had

18  changed her start time on the date in question and did not know why it was changed (Fukunaga Decl.

19  Ex. D ("Darby Depo.") at 48); (2) Mr. Wassie, who learned that his start time had been changed on

20  the day of Ms. Hale's visit and stated that it was in part to avoid a meal period penalty (Fukunaga

21  Decl. Ex. E ("Wassie Depo.") at 23-24); and (3) Mr. Yoshidome, who was not informed that his

22  timecard had been edited but confirmed that he did not start work until 10:00 a.m. so the change was

23  warranted (Fukunaga Decl. Ex. F ("Yoshidome Decl.") at 113).

24      Following the site visit, Ms. Hale sent another email to Ms. Coulombe explaining her findings

25  and relayed Mr. Impey's explanation regarding the time changes.  See Hale Decl. Ex. A.  Ms. Hale's

26  email also explained that Ms. Darby said she did not know why Plaintiff changed her time and was

27  unaware he had done so; Mr. Wassie agreed that he did not start until 10:00 a.m. and that he wanted

28  to avoid a meal period penalty; and Mr. Yoshidome could not explain the change but agreed that he

United States District Court

For the Northern District of California

1  started work at 10:00 a.m. as edited.  Id.[2]  Ms. Hale concluded by stating that she "let Dan know [she]

2  was not able to get a reasonable explanation as to why the changes were made."  Id.

3        Thereafter, a joint decision by Ms. Perry, Ms. Coulombe, and Mr. Mehranbod (Ms. Perry's

4  supervisor) was made to terminate Mr. Impey for falsification of time records in violation of

5  company policy.  Fukunaga Decl. Ex. G (Coulombe Depo.) at 104-05; Ex. H (Perry Depo.) at 152;

6  Coulombe Decl. Ex. A at 17, Ex. B at DEF00328, DEF00354.  Mr. Impey was terminated on October

7  7, 2008 at the age of 55.  At that time, Ms. Hale was 49 years old, Ms. Coulombe was 48 years old,

8  Ms. Perry was 48 years old, and Mr. Mehranbod was 44 years old.  Coulombe Decl. ¶ 17.  Mr. Impey

9  was replaced by Jose Felix, a 38-year-old, apparently non-disabled, man.  Fukunaga Decl. Ex. I at 2;

10  Yoshidome Depo. at 166.  Mr. Felix had three years of experience with Office Depot, including as an

11  assistant store manager at a training store, and was paid less than Mr. Impey.  Perry Depo. at 144-46.

12        **B.    Office Depot's Treatment of Other Timecard Policy Violators**

13        In late 2008, Ms. Hale initiated an investigation of another Bay Area Office Depot store based

14  on an unusual number of timecard edits that appeared to have been done specifically to avoid meal

15  period penalties.  Hale Decl. ¶ 7; Sivarajah Decl. Ex. B (Perry Depo.) at 121; id. Ex. F-1 at

16  DEF00675.  During the investigation, 32-year-old non-disabled assistant store manager M.M.

17  admitted to altering time cards to avoid meal period violations and immediately tendered his

18  resignation.  Lindo Decl. ¶ 2, 3, Ex. A; Coulombe Decl. ¶ 14.  The store manager, M.C., was issued a

19  final PIP, but not terminated, according to Office Depot because he had only recently been hired and

20  trained on the timekeeping system.  Fukunaga Decl. Ex. G (Coulombe Depo.) at 118; Perry Depo. at

21  122-23, 140; Hale Depo. at 181; Sivarajah Decl. Ex. F-1 at DEF00686, DEF00699-700.  M.C. was 36

22  years old at the time.  Fukunaga Decl. Ex. I at 2.

23        Around the same time, another Bay Area store was also investigated and an unusual number

24  of timecard edits were discovered.  Office Depot concluded that the 38-year-old non-disabled store

25

26  _____

27  [2] After-the-fact evidence indicates that Mr. Yoshidome likely did in fact start work at 10:00 a.m. on the
    day in question, and therefore the edit to this timecard may have been appropriate.  Hale Depo. at 162-

28  63; Perry Depo. at 95; Coulombe Depo. at 90; Yoshidome Depo. at 169; Impey Decl. ¶ 22.  Mr. Impey
    also now contends that he made the edits to Ms. Darby and Mr. Wassie's timecards because he was
    present when they clocked in early, and instructed them not to begin work until their scheduled start
    times.  Impey Decl. ¶¶ 21-22.  However, he did not testify to this during his deposition and it does not
    appear that he ever provided this explanation to anyone during the investigation.

United States District Court

For the Northern District of California

1   manager M.T. had made the edits to avoid meal period penalties.  Lindo Decl. ¶ 4, 5, Ex. B.  As a

2   result, M.T. was terminated.  M.T. had a prior PIP related to unspecified wage and hour and meal/rest

3   period violations, which was issued to him in lieu of termination for his first infraction.  Sivarajah

4   Decl. Ex. B (Perry Depo.) at 132-33, Ex. B-1 at DEF01005; but see Fukunaga Decl. Ex. G

5   (Coulombe Depo.) at 111 (noting that M.T. had a prior formal write-up and documented counseling,

6   but not a final PIP).[3]

7          In July 2008, assistant store manager M.V. was investigated for changing an employee's time

8   record.  Lindo Depo. at 102.  M.V. explained that she changed the employee's clock-in time to her

9   scheduled start time because "she had clocked herself in early when she was not working (she was

10   hanging out in the back)."  Sivarajah Decl. Ex. B-1 at DEF1007.  Office Depot accepted this

11   explanation.  Sivarajah Decl. Ex. E (Lindo Depo.) at 102.

12          In June 2008, M.L., a department manager at a Bay Area store, was investigated for making

13   time card changes to avoid meal period penalties.  Lindo Decl. ¶ 2, Ex. A at DEF00686.  It was

14   determined that another individual stole his password to perform the edits and M.L. was told to

15   change his password but was not otherwise disciplined.  Id.

16   **II.    Legal Standard**

17          Motions for summary judgment of federal and state employment discrimination actions are

18   analyzed under the three-step burden-shifting framework established in McDonnell Douglas Corp. v.

19   Green, 411 U.S. 792 (1973).  See, e.g., Chuang v. University of California Davis, 225 F.3d 1115,

20   1123-24 (9th Cir. 2000) (citing McDonnell Douglas).  First, plaintiff must establish a prima facie case

21   of discrimination under FEHA by showing that: (1) he is a member of a protected class (i.e., over 40

22   years old or suffering from (or perceived to be suffering from) a disability); (2) he is otherwise

23   qualified to do his job; (3) he suffered an adverse employment action; and (4) the employer harbored

24   discriminatory intent.  Avila v. Continental Airlines, 165 Cal. App. 4th4 1237, 1246 (2008).   The

25   proof necessary for a plaintiff to establish a prima facie case is "minimal" and need not even rise to

26   the level of a preponderance of the evidence.  See id. (citing Wallis v. J.R. Simplot Co., 26 F.3d 885,

27   889 (9th Cir. 1994)).  The plaintiff need only offer evidence that "gives rise to an inference of

28

---

[3]No party has explained the difference between a PIP and a formal written writeup and counseling, or whether this is a distinction of relevance to this motion.

**United States District Court**
For the Northern District of California

1  unlawful discrimination," arising either under the <u>McDonnell Douglas</u> presumption or by more direct

2  evidence of discriminatory intent.  <u>Wallis</u>, 26 F.3d at 889.

3        If the plaintiff proves his prima facie case, the burden of production then shifts to the

4  employer to articulate a legitimate, nondiscriminatory business reason for the alleged action.  <u>See</u>

5  <u>Guz v. Bechtel National, Inc.</u>, 24 Cal. 4th 317, 355-356 (2000).  If the employer does so, the

6  presumption of discrimination disappears and the plaintiff must show that the articulated reason is

7  pretextual, "'either directly by persuading a discriminatory reason more likely motivated the

8  employer or indirectly by showing that the employer's proffered explanation is unworthy of

9  credence.'"  <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 256 (1981); <u>see also</u>

10  <u>Arteaga v. Brink's Inc.</u>, 163 Cal. App. 4th 327, 343 (2008).  The ultimate burden of persuading the

11  trier of fact that the employer intentionally discriminated remains at all times with the plaintiff.  <u>See</u>

12  <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 143 (2000) (citing <u>Burdine</u>, 450 U.S. at

13  253).

14        Office Depot argues that Mr. Impey cannot raise a triable issue of fact as to a prima facie

15  showing of either disability or age discrimination, and that even if he can, the undisputed facts show

16  that Defendant terminated Plaintiff for legitimate reasons that were not pretextual.

17  **III.**    **Employment Discrimination Under FEHA**

18        **A.**    **Prima Facie Showing**

19        There is no dispute that Plaintiff was over the age of forty and disabled (or, alternatively,

20  perceived to be disabled), and that he was a "qualified individual" at the time of his termination.

21  Therefore, with respect to his prima facie showing, the only question is whether the fourth factor is

22  met; i.e., has he presented evidence giving rise to an inference that Office Depot harbored

23  discriminatory intent, either on the basis of his age or his disability.  This can be shown by

24  demonstrating that Plaintiff was replaced by someone outside of his protected class.  <u>See, e.g., Nesbit</u>

25  <u>v. PepsiCo, Inc.</u>, 994 F.2d 703, 705 (1993) (prima facie case of age discrimination can be shown

26  where plaintiff was replaced by "substantially younger employee with equal or inferior

27  qualification").

28        Plaintiff contends that he has met his initial burden of showing an inference of discrimination

because he was replaced by Jose Felix, a 38-year-old, non-disabled man.  <u>See</u> Fukunaga Decl. Ex. I

1   (listing Mr. Felix as a 38-year-old store manager at the time of Mr. Impey's termination); Sivarajah

2   Decl. Ex. D (Yoshidome Depo.) at 166 (stating that he did not know Mr. Felix to have a disability).

3   He further contends that Mr. Felix had "very limited experience" when he replaced Mr. Impey.  Opp.

4   at 17.  Office Depot counters that Plaintiff has "no evidence" of Mr. Felix's qualifications or whether

5   his own were superior.  Reply at 14.  However, there is evidence that Mr. Felix was hired in 2005,

6   eight years after Plaintiff, and was previously an assistant store manager at a training store before

7   replacing Plaintiff, whereas Plaintiff had been a store manager for some time.  See Fukunaga Decl.

8   Ex. I; Sivarajah Decl. Ex. B (Perry Depo.) at 144.  Therefore, it can be inferred that he was younger,

9   was non-disabled, and had less experience than Plaintiff.

10         In support of his prima facie case, Plaintiff also points to his own testimony that his

11   supervisor, Ms. Perry, called him an "old timer" on more than one occasion despite his complaint

12   about the term.  Sivarajah Decl Ex. A (Impey Depo.) at 128-131.  He further points to his contentions

13   that Ms. Perry required a doctor's note from him during an absence from work for the first time

14   following his return from disability leave.  Id. at 37; Impey Decl. ¶ 10.[4]  However, he does not

15   explain whether this new requirement was inconsistent with treatment of other employees or

16   company policy, or how this gives any indication of discriminatory intent.  Finally, he argues that the

17   fact that he was not provided with another assistant store manager following his assistant store

18   manager's resignation is evidence of discrimination.  But this contention, even if true, is belied by

19   undisputed evidence that his store did not qualify for an additional assistant manager because of

20   diminished volume, and therefore is unhelpful to Plaintiff.

21         Office Depot argues that Plaintiff's preliminary showing is insufficient because he must "at

22   least show actions taken by the employer from which one can infer, if such actions remain

23   unexplained, that it is more likely than not that such actions were based on a [prohibited]

24   discriminatory criterion."  Guz v. Bechtel National, Inc., 24 Cal. 4th 317, 355 (2000).  Office Depot

25   argues that Plaintiff's evidence does not give rise to this inference, and goes on to challenge the

26   substance of Plaintiff's evidence.  For example, Office Depot cites Nesbit v. Pepsico, Inc., 994 F.2d

27   703, 705 (9th Cir. 1993), where the Ninth Circuit found that a supervisor's comment that "we don't

28

_____

[4] Plaintiff's Opposition states that the absence was "one day," but the note indicates that he was absent for three days.  Fukunaga Decl. Ex. L; Perry Decl. ¶ 6.

United States District Court

For the Northern District of California

1  necessarily like grey hair" was uttered in an ambivalent manner and was not directly tied to the

2  termination in question and therefor did not create an inference of discrimination.  However, <u>Nesbit</u>

3  was a FEHA "reduction in workforce" case where the Ninth Circuit also rejected Plaintiff's effort to

4  establish his prima facie case using statistical evidence that some older workers were terminated

5  while some younger workers were retained and subsequently hired employees were generally

6  younger, finding no statistical pattern adversely affecting older employees.  <u>Id</u>. at 705.  In contrast,

7  here there is at least some evidence that Plaintiff was directly replaced by a non-disabled individual

8  17 years younger than him and with less tenure at Office Depot and experience only as an assistant

9  store manager, whereas Plaintiff was a store manager.  Based on this evidence alone, Plaintiff has

10  satisfied his "minimal" initial burden of raising a triable issue of a prima facie showing because the

11  trier of fact could infer discriminatory intent simply from his replacement by a far younger, non-

12  disabled individual.

   **B.  Legitimate business reasons**

14  If a plaintiff establishes a prima facie case for disability discrimination, the burden shifts to

15  the defendant to articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory or

16  retaliatory conduct.  <u>Surrell v. Cal. Water Serv.</u>, 518 F.3d 1097, 1106 (9th Cir. 2008); <u>Mixon v. Fair</u>

17  <u>Employment & Housing Comm'n</u>, 192 Cal. App. 3d 1306, 1316-19 (1987) (adopting the standards

18  set by the United States Supreme Court for proving intentional discrimination).  An employer need

19  not persuade the court that it had convincing objective reasons for the termination.  <u>Burdine</u>, 450 U.S.

20  at 254-55, 257.  If nondiscriminatory, an employer's reasons for the termination "need not necessarily

21  have been wise or correct."  <u>Guz</u>, 24 Cal. 4th at 358.

22  Office Depot argues that it has presented specific, factual evidence that Plaintiff was

23  terminated for legitimate, nondiscriminatory reasons.  Specifically, it contends that Plaintiff

24  admittedly edited timecards, and failed to provide a sufficient explanation during the investigation

25  even though he was given an opportunity to do so.  Fukunaga Decl. (Impey Depo.) at 83.  He also did

26  not attempt to further explain his actions or challenge the investigation in the week between the

27  investigation and his termination.  Hale Decl. ¶ 4; Compl. ¶ 5.  Further, Office Depot notes that,

28  while termination for editing three time cards to comply with wage and hour regulations seems harsh,

   in order to avoid wage and hour litigation, employers must send a clear message that timekeeping and

United States District Court

For the Northern District of California

1    meal break laws are taken seriously.  Office Depot cites <u>King v. United Parcel Service, Inc</u>., 152 Cal.

2    App. 4th 426, (2007), where the court affirmed summary judgment in favor of an employer where a

3    disabled employee was terminated for either personally falsifying one timecard or directing another

4    employee to do so in order to comply with federal regulations.  However, in <u>King</u>, the employee

5    admitted to falsifying the timecard in question in order to avoid wage and hour violations, unlike

6    Plaintiff.  Office Depot also notes that its employees are allowed to punch in five minutes early, so

7    there would be no reason to change an employee's start time by less than this amount (i.e., the two

8    and four minutes in question) other than to avoid meal period penalties, and this fact also prompted

9    its belief that Plaintiff had acted improperly in editing the timecards.  Finally, Office Depot argues

10   that Plaintiff knew he had done something wrong and believed he was going to be "given another

11   corrective" for his actions.  <u>See</u> Impey Depo. at 61-63 (he "thought he was going to be given another

12   corrective" based on Ms. Hale's audit and the "time card violations," though he did not expect to be

13   terminated). However, Plaintiff's testimony does not make clear whether he knew he had done

14   something wrong because Ms. Hale told him he had during the investigation, or because he actually

15   believed that what he had done was wrong, and therefore this evidence is not helpful to Defendant.

16       The Court agrees with Office Depot that its stated reason for Plaintiff's termination – editing

17   timecards in such a manner that it appeared Mr. Impey was trying to avoid meal period penalties –

18   articulates a legitimate, nondiscriminatory reason for his termination.  This is especially true given

19   his deposition testimony that he did not attempt to explain his actions to anyone during the

20   subsequent investigation when questioned about them.  Fukunaga Decl. (Impey Depo.) at 83; <u>but see</u>

21   Impey Decl. at ¶ 23.  Even if it is true that Plaintiff personally witnessed the three individuals in

22   question clock in early, and he simply changed their times to reflect their accurate start times in

23   accordance with Office Depot policy, Office Depot has presented evidence that it reasonably believed

24   that the changes were actually made to avoid meal period penalties and it terminated him on this

25   basis. Therefore, based on the undisputed facts, Office Depot has stated a legitimate,

26   nondiscriminatory business reason for the termination.

27       **C.    Pretext**

28       If an employer articulates a legitimate reason for its action, the presumption of discrimination

drops out, and the plaintiff must offer evidence that the employer's proffered non-discriminatory

1   reason is merely a pretext for discrimination.  <u>Surrell</u>, 518 F.3d at 1106.  Pretext may be

2   demonstrated by direct evidence showing that unlawful discrimination more likely motivated the

3   employer, or indirect evidence showing that an employer's reasons are unworthy of credence because

4   they are internally inconsistent or otherwise not believable.  <u>Chuang v. Univ. of Cal. Davis, Bd. Of</u>

5   <u>Trustees</u>, 225 F.3d 1115, 1127 (9th Cir. 2000).  Plaintiff must produce specific and substantial

6   evidence that the defendant's reasons are really a pretext for discrimination.  <u>Aragon v. Republic</u>

7   <u>Silver State Disposal, Inc.</u>, 292 F.3d 654, 661 (9th Cir. 2002); <u>see also Coghlan v. Am. Seafoods Co.</u>,

8   413 F.3d 1090, 1095-96 (9th Cir. 2005) (circumstantial evidence "must be 'specific and substantial'

9   to defeat employer's motion for summary judgment").

10            **1.       Falsity of Reason for Termination**

11           Plaintiff argues that Office Depot's only stated reason for his termination – improperly editing

12   two time cards by minutes and failing to provide an explanation for doing so – is demonstrably false

13   and therefore pretextual.  First, Plaintiff argues that Ms. Perry said he was fired because he could not

14   provide an explanation for the timecard edits, but he points to his written explanation of the time card

15   edits in the comments section of the timekeeping management system, where he explained that two of

16   the changes were made to reflect actual start times, and one was because he "neglected to adjust

17   schedule."  <u>See</u> Impey Decl. Exs. A, B, C.  He also refers to Ms. Hale's email stating what he told her

18   during the investigation.  He contends that these explanations make the edits conform with company

19   policy and refute the basis for his termination.  Office Depot counters that Plaintiff's comments on

20   the time cards are not dispositive of the issue, because if Plaintiff was trying to improperly edit time

21   cards he would very likely include innocent explanations and Office Depot was not required to accept

22   these at face value.  Instead, Office Depot contends that Ms. Hale thought that the edits looked

23   suspicious despite the comments and given that the amount of the edits avoided two meal period

24   penalties, conducted an investigation, and gave Plaintiff a chance to explain his actions which he

25   failed to do at the time.  <u>See</u> Hale Decl. Ex. A; Supp. Fukunaga Decl. Ex. P (Hale Depo.) at 151-52;

26   <u>id</u>. at Ex. R (Impey Depo.) at 74-75, 83.

27           In connection with this argument, Office Depot challenges Plaintiff's declaration, filed in

28   opposition to its motion, in which he states that during the investigation he "provided Ms. Hale the

same explanation that I had written in the comments section of the time sheets."  Impey Decl. ¶ 23.

**United States District Court**
For the Northern District of California

14

**United States District Court**
For the Northern District of California

1  Office Depot contends that this declaration directly contradicts his earlier deposition testimony in

2  which he stated that he "can't recall" his exchange with Ms. Hale or any specifics of an explanation

3  to her, and did not tell Ms. Hale or a member of management why he edited the time cards (see

4  Impey Depo. at 71-75, 83), and therefore his declaration on this point should be disregarded as a

5  "sham."  In determining whether to consider Plaintiff's declaration for this point, the question is

6  whether it clearly and unambiguously contradicts his prior deposition testimony, was prepared

7  specifically in opposition to a summary judgment motion, and the contradiction has not been

8  explained, such that the Court may consider the declaration a "sham" and refuse to consider it.  See

9  Kennedy v. Allied Mutual Ins. Co., 952 F.2d 262, 266-67 (9th Cir. 1991).  In Van Asdale v.

10 International Game Technology, 577 F.3d 989, 998-999 (9th Cir. 2009), the Ninth Circuit explained

11 that the doctrine should be "applied with caution," but is required because, "if a party who has been

12 examined at length on deposition could raise an issue of fact simply by submitting an affidavit

13 contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as

14 a procedure for screening out sham issues of fact."  Id.  The Ninth Circuit has imposed two

15 limitations on a district court's discretion to invoke the sham affidavit rule: (1) "the district court

16 must make a factual determination that the contradiction was actually a "sham" and (2) "the

17 inconsistency between a party's deposition testimony and subsequent affidavit must be clear and

18 unambiguous to justify striking the affidavit."  Id. at 999.

19       Here, Mr. Impey's declaration is somewhat inconsistent with the part of his deposition

20 testimony where he expressly stated that he did not tell Ms. Hale or another member of management

21 why he edited the timecards, the declaration was prepared for the summary judgment opposition, and

22 the contradiction has not been explained.  However, at his deposition he also stated that he did not

23 recall what he said to Ms. Hale, so the fact that he recalls this information later is not a direct

24 contradiction.  It is possible that, once he reviewed Ms. Hale's email explaining her conversation

25 with him (which is in some, but not all, ways consistent with this portion of his declaration), his

26 recollection was refreshed when he prepared the later declaration.  See Hale Decl. Ex. A.  Therefore,

27 the Court will not strike Mr. Impey's declaration as a sham.  However, the Court notes that during

28 oral argument, Mr. Impey did not rely on his declaration for this point, and the Court does not do so

   either.  Instead, the Court finds that Mr. Impey's comments on the timecards, as well as Ms. Hale's

15

**United States District Court**
For the Northern District of California

1  email regarding Mr. Imepy's explanation during the investigation, are at least some evidence that he

2  provided a reasonable explanation for the edits.  Based on this evidence, in conjunction with other

3  evidence discussed below and drawing all reasonable inferences in Plaintiff's favor as required, a

4  trier of fact could find that Office Depot was unreasonable in concluding that the edits were made for

5  an improper purpose.

6           Moreover, in connection with Ms. Hale's investigation of the timecard edits in question, Ms.

7  Hale also spoke directly to Ms. Darby, Mr. Wassie and Mr. Yoshidome. Based on these conversations

8  (as well as her conversation with Plaintiff), she stated that she "could not get a reasonable explanation

9  as to why the changes were made."  Supp. Coulombe Decl. Ex. A.  Two of these conversations

10 provide some support for Office Depot's position, while the conversation with Mr. Yoshidome

11 supports Plaintiff's position.   Specifically, Mr. Wassie "echoed what Dan said about his schedule not

12 starting until 10:00, but also said he wanted to avoid the meal period penalty."  Supp. Coulombe

13 Decl. Ex. A.; see also Sivarajah Decl. Ex. F (Hale Depo.) at 162 (Mr. Wassie told Ms. Hale that

14 Plaintiff told him that he was not scheduled to start until 10:00); Fukunaga Decl. Ex. E (Wassie

15 Depo.) at 23-24 (Plaintiff told him about the change to his timecard on the day of Ms. Hale's

16 investigation and he was surprised because he did not know anything about it).  Even if true that Mr.

17 Wassie agreed with Mr. Impey that he had not actually started work until 10:00 a.m., his statement to

18 Ms. Hale that he desired to avoid a meal period penalty as an additional reason for the timecard edit

19 made it reasonable for Ms. Hale to conclude that the edit was not done for a proper purpose.

20          Similarly, Ms. Darby told Ms. Hale that she did not know why Plaintiff would have changed

21 her punch in time and she was not aware that he had done so.  Id.; see also Fukunaga Decl. Ex. D

22 (Darby Depo.) at 48 (Plaintiff never communicated to her that start time had been changed).

23 However, Ms. Darby also said that she "generally clocks in a few minutes early to ensure that she is

24 on time."  Supp. Coulombe Decl. Ex. A.; see also Sivarajah Decl. Ex. F (Hale Depo.) at 161-62 (Mr.

25 Impey told Ms. Hale that Ms. Darby clocked in but was not working yet; Ms. Darby told Ms. Hale

26 that she did not recall Plaintiff changing her start time).  Viewing this testimony in the light most

27 favorable to Plaintiff, the undisputed evidence is simply that Plaintiff told Ms. Hale that he changed

28 Ms. Darby's timecard because she clocked in before she started working, and Ms. Darby told Ms.

Hale that she did not know why Plaintiff changed her timecard and he did not notify her he had done

United States District Court
For the Northern District of California

1  so, but that she did clock in early sometimes.  There is nothing suspicious about Ms. Hale giving

2  more weight to Ms. Darby's account than Mr. Impey's and therefore concluding that the edit was

3  made to avoid a meal period penalty.

4        In contrast, Mr. Yoshidome "could not explain why there was an original punch for 7:06 or

5  why it would have been changed," but also told Ms. Hale he was "fairly certain" he started work at

6  10:00 a.m. that day. Supp. Coulombe Decl. Ex. A.; see also Sivarajah Decl. Ex. F (Hale Depo.) at

7  163; Ex. D (Yoshidome Depo.) at 95-96 (Mr. Yoshidome does not recollect talking to Plaintiff to

8  disagree with hours reflected on timecard in question); Ex. B (Perry Depo.) at 95-96 (Ms. Hale told

9  Ms. Perry that Mr. Yoshidome told her he did not start work until 10:00 a.m. on the day in question

10  and Ms. Perry did not have a problem with that edit); Ex. C (Coulombe Depo.) at 90 (Ms. Coulombe

11  had no reason to doubt that Mr. Yoshidome worked at 10:00 a.m. that day).  Given that the only

12  information before Ms. Hale during the investigation was that Mr. Yoshidome was "fairly certain" he

13  had started at 10:00 a.m. as edited by Plaintiff, a jury could conclude that it was unreasonable for Ms.

14  Hale to conclude that this edit was made to avoid a meal period penalty, and therefore pretextual.

15        Second, Plaintiff argues that his edits and/or explanation were the same as that of another

16  employee, M.V., but she was not reprimanded for her edit.  M.V. stated that she changed an

17  employee's clock-in time to her scheduled start time because "she had clocked herself in early when

18  she was not working (she was hanging out in the back)."  Sivarajah Decl. Ex. B-1 at DEF1007; see

19  also Supp. Fukunaga Decl. Ex. Q at 102.   Office Depot accepted this explanation. Sivarajah Decl.

20  Ex. E (Lindo Depo.) at 102.  Defendant counters that the circumstances were different because M.V.

21  was an assistant store manager, not a store manager like Plaintiff, did not report to Ms. Perry, and

22  provided a plausible explanation to Mr. Lindo at the time of the investigation.  Further, there is no

23  evidence of whether or not the timing of M.V.'s timecard change indicated that she made the edit to

24  avoid a meal period or other penalty, so this situation is not necessary analogous to Plaintiff.

25  However, an evaluation of the similarities and differences between Plaintiff and M.V., and their

26  treatment by Office Depot, could be viewed as an improper weighing of evidence on summary

27  judgment, and therefore the Court declines to do so.  A trier of fact might find that M.V. and Plaintiff

28  were similarly situated but treated differently, and that this is some indication of pretext.

Third, Plaintiff argues, without citation to evidence, that Ms. Darby, Mr. Wassie and Mr. Yoshidome had to approve their timecards on a weekly basis and affirmatively confirm their accuracy.  Therefore, according to Plaintiff, their testimony that they did not know about the edits before the investigation is suspect.  Defendant did not address this point during oral argument.  However, even if true, it is unclear how this helps Plaintiff, given that Mr. Wassie told Ms. Hale that his edit was made to avoid a meal period penalty.

Fourth, Plaintiff argues that his edits conformed to Office Depot and Ms. Perry's policy of ensuring that employees do not clock in early.  Office Depot did not address this point during oral argument, and it is undisputed that Office Depot, Ms. Perry and Plaintiff were strict about enforcing this policy.   However, it is also undisputed that Office Depot allows employees to clock in five minutes early to ensure that they are on time, so changing a start time by less than five minutes does not seem to enforce the policy, and instead serves only to avoid meal period penalties.  Because resolution of this issue requires some weighing of undisputed facts, on summary judgment it falls in favor of Plaintiff.

Fifth, Plaintiff argues that there is evidence that he was not avoiding paying penalties because he had previously paid many penalties and it is unreasonable to conclude that he would have made the edits in question to avoid just two more.  However, Plaintiff has cited no evidence of this in either his papers or at oral argument other than his own declaration about how many edits he made.  Office Depot counters that this argument is irrelevant and speculative, and the Court agrees.

For the foregoing reasons, Plaintiff has presented some evidence, albeit fairly slim, that could create a triable issue of fact as to whether Office Depot's stated motive for firing him was "false" or "implausible" to support a pretext argument.

### 2.    Evidence That The True Reason For Termination Was Discriminatory

Office Depot argues that Plaintiff cannot show a discriminatory motive because, by his own admissions, he was hired at the age of 44, "quickly advanced" to the position of store manager at age 48 despite significant leaves of absence based on his disability, and was later transferred to a "more important" store.  Further, according to Office Depot, he has no evidence of discriminatory intent based on age or disability.  The Court disagrees.

### a.    Similarly Situated Employees

Plaintiff primarily argues that the reason for his termination was pretextual because employees whom he deems "similarly situated" but outside of his protected classes were treated more favorably.  He argues that his termination was harsher than the actions taken against other Office Depot employees, including store managers M.C. and M.T., who were not disciplined or only given a warning.[5]  Plaintiff cites Bowden v. Potter, 308 F. Supp. 2d 1108, 1120 (N.D Cal. 2004) for his position that a finding that more favorable treatment of even one similarly situated employee is sufficient to show pretext.  However, in Bowden, the Court listed the disparate treatment of one other similarly situated individual in a list of five factors in holding that the disparate treatment could, along with the other factors, create a triable issue of fact as to pretext.

With respect to M.C., Plaintiff argues that he had 391 timecard edits, 97 of which appeared to be done to avoid meal period penalties, and that Ms. Coulombe noted that these edits were the worst she had seen, yet M.C. only received a PIP.  At oral argument, Defendant countered that Plaintiff misstates the evidence because M.C. was only personally responsible for 3 edits (and someone stole his password and made others), and that he was new to the company (5 months) and not adequately trained on the timekeeping system.  Plaintiff did not dispute that M.C. was only personally responsible for three edits, but argues that the explanation that he got a PIP because he was new was inconsistent and unreasonable because his edits increased with his longevity with the company.  Resolving the factual inquiry of whether M.C. was similarly situated, who was responsible for making his edits, whether his level of discipline was more lenient than Plaintiff's, and other relevant questions regarding this individual, are matters subject to reasonable disagreement and therefore for the jury.  See Bowden v. Potter, 308 F. Supp. 2d 1108, 1117 (N.D. Cal. 2004) (Chen, J.) (noting that the critical question in determining whether an employee is similarly situated is whether they are similarly situated in "all material aspects" and that a reasonable jury could find that two employees were similarly situated despite some differences in their positions and offenses).

---

[5] In his papers, Plaintiff also argued that assistant/department managers M.V. and M.L. were treated more favorably, but did not make this argument at oral argument, apparently conceding that they were not similarly situated.  This is likely because there is no evidence of either of these individuals' ages or disability status, and neither were exempt store managers with duties or responsibilities similar to Plaintiff's.

United States District Court

For the Northern District of California

With respect to M.T., Plaintiff contends that he was subjected to progressive discipline instead of immediate termination; he received a PIP for his first timecard alteration offense and was only terminated for his second offense (unlike Plaintiff who was terminated for his first offense). Office Depot counters that the first offense was for other wage and hour violations (Sivarajah Decl. Ex. B (Perry Depo.) at 132, Ex. B-1 at DEF1005), and he was terminated for his first timecard edit to avoid a meal period penalty.   Office Depot attempts to equate M.T.' previous wage and hour violations with Mr. Impey's own previous PIP in connection with M.F.'s violation and resignation, and notes that when M.T. was later found to have falsified employee time records for the first time, he was terminated – just like Plaintiff.  However, it is reasonably debatable whether M.T.' previous "wage and hour" issues are sufficiently similar to Mr. Impey's actions to illustrate differential treatment of Plaintiff, so resolution of these factual issues is the province of the jury.

Because there are triable issues of fact as to whether either M.C. or M.T. was a similarly situated employee outside of Plaintiff's protected class who was treated more favorably than Plaintiff, this "comparator" evidence, together with other disputed evidence, weighs against Defendant's Motion for Summary Judgment.

### b. Other Evidence

#### i.    Age-Related Comments

Office Depot contends that Plaintiff has admitted that he has no evidence of discrimination based on age, other than a conclusory and unsubstantiated statement in his Complaint that he was "one of the oldest at 55 and was also on the higher end of the pay range with a salary of approximately $76,000 per year." Impey Depo. at 133-36 (admitted that he had no facts to suggest he was terminated based on age); Compl. ¶ 16.  Office Depot points to evidence relating to two other store managers in Plaintiff's district were also over the age of 40, earned more than Plaintiff, and are still employed by Office Depot.  See  Fukunaga Decl. Ex. I; Coulombe Decl. ¶ 12; Stauffer Depo. at 11, 43-46; Dewey Decl. ¶¶ 4-5.  Both have testified that they never felt discriminated against on the basis of age.  Fukunaga Decl. Ex. J (Stauffer Depo.) at 11, 43-46, 36, 153-54; Dewey Decl. ¶ 2. While the fact that these two individuals are still employed by Office Depot does provide some evidence to counter an inference of discriminatory motive based merely on Plaintiff's age and alleged

United States District Court

For the Northern District of California

1    salary, Plaintiff persuasively argues that he need not show a "clean sweep" of all older employees or

2    those paid more than him to raise a triable issue of fact.

3          Office Depot also argues that Trudy Perry's reference to Plaintiff as an "old timer" does not

4    show discriminatory intent, because Plaintiff has admitted that he did not know what she meant by

5    the term (Impey Depo. at 129-30), and his subjective belief that the remark referred to his age is

6    insufficient.  Trudy Perry contends that she was referring to the length of time Plaintiff had been with

7    the company, as opposed to his age.  Perry Decl. ¶ 5.  Ms. Dewey, whom Ms. Perry also referred to as

8    an "old timer," thought that the comment referred to tenure and not age, and noted that she and

9    Plaintiff sometimes used the term to refer to themselves.  Dewey Decl. ¶ 7.  Plaintiff has admitted

10   that Ms. Perry did not otherwise indicate that she was biased against older people.  Fukunaga Decl.

11   Ex. A (Impey  Depo.) at 131.

12         The Court agrees with Office Deport that these comments are ambiguous and on their face do

13   not necessarily seem to refer to age, but rather to longevity with the company.  However, at oral

14   argument, Plaintiff persuasively pointed out that Ms. Perry's declaration only purported to explain the

15   "old timer" comments with respect to Karen Dewey and Plaintiff.   Perry Decl. ¶ 5.  Plaintiff argues

16   that the declaration notably does <u>not</u> state that she also referred to Mr. Stauffer (who was a store

17   manager for longer than Plaintiff and Ms. Dewey but younger than both of them) as an "old timer."

18   This may be because Plaintiff only testified with certainty that Ms. Perry called him and Ms. Dewey

19   "old timers," and "maybe Ralph [Stauffer]."  Impey Depo. at 129 ("She basically said, you know,

20   'Ralph, Dan' – I don't know if she said Ralph specifically – 'Karen have been around a long time, got

21   a lot of time with this company.'").   Therefore, Ms. Perry may not have felt the need to rebut

22   Plaintiff's equivocal testimony about whether or not she referred to Mr. Stauffer as an old timer.

23   Regardless, she did not do so.

24         Office Deport also relies on <u>Nidds v. Schindler Elevator Corp.</u>, 113 F.3d 912, 918 -919 (9th

25   Cir. 1996), where the Ninth Circuit held that a supervisor's reference to getting rid of "old timers"

26   was insufficient evidence to raise a genuine issue of fact as to whether the reason for the plaintiff's

27   termination was discriminatory under California's FEHA statute.  The Court found that the comment,

28   like the one in <u>Nesbit v. Pepsico, Inc.</u>, 994 F.2d 703, 705 (9th Cir.1993) (holding that statement that

     "[w]e don't necessarily like grey hair" was insufficient) was "ambiguous because it could refer as

well to longtime employees or to employees who failed to follow directions as to employees over 40" and was not tied to the plaintiff's layoff.  Id.  Therefore, it was too weak to create an inference of age discrimination.  Id.

While the Ninth Circuit's interpretation of FEHA would be persuasive if the issue were not currently pending before the California Supreme Court, California law regarding similar "stray remarks" in the context of employment discrimination summary judgment is currently under consideration by the California Supreme Court in Reid v. Google, Inc. (argued in May, 2010).  If the California Supreme Court articulates a different standard for "stray comments" in Reid, then evidence of Ms. Perry's "old timers" references may aid Plaintiff even more strongly in raising a triable issue of pretext.  The Court raised this issue at oral argument, and the parties agree that a decision in Reid could impact this case in some way.  Therefore, the pendency of Reid cautions further against granting Defendant's Motion for Summary Judgment.

Office Depot's Motion also appears to argue that Mr. Impey has not adequately presented evidence of age discrimination because it is undisputed that all of the decision makers involved in the decision to terminate him (Perry, Coulombe, and  Mehranbod) were over the age of 40.  Motion at 13; Coulombe Decl. ¶ 17.  Office Depot cites cases where summary judgment was granted in instances where the decision makers were in the same protected class as the plaintiff.  See Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1471 (11th Cir. 1991) ("Elrod faces a difficult burden here, because all of the primary players behind his termination . . . were well over age forty and within the class of persons protected by the ADEA. These three are more likely to be the victims of age discrimination than its perpetrators.")  However, Plaintiff persuasively counters that discrimination can occur between members of the same protected class, and that in any event the ages of the decision-makers does not impact his disability discrimination claim.

### ii.    Disability-Related Comments

Office Depot contends that there is no direct evidence of discriminatory intent based on disability because Plaintiff admits that he never heard anyone make a negative comment about his back injury and none of the decisionmakers ever said anything indicating that they were biased against people with disabilities.  Fukunaga Decl. Ex. A (Impey Depo.) at 137, 139-40.  Office Depot contends that his testimony that, a year before he was terminated, "someone" commented about the

validity of his injury, is insufficient because he does not know who said it or if the comment was really made. Id. Therefore, according to Office Depot, the only evidence that Plaintiff has presented concern the instances where Ms. Perry: (1) told Plaintiff not to lift beyond his restrictions, (2) made comments about his back and/or commented on his weight upon return from a leave of absence due to surgery; and (3) asked him for a doctor's note when he was out sick. Plaintiff admittedly did not bring these allegedly discriminatory comments to the attention of human resources or management. Impey Depo. at 114, 116-17. However, Plaintiff testified that Ms. Perry's comments were made in a sarcastic manner and tone, even though they seem innocuous on their face. Impey Depo. at 112-113.

With respect to comments about his weight, Office Depot argues that Plaintiff's evidence on this point is only contained in interrogatory responses, but during his deposition he did not mention this comment as being inappropriate. Plaintiff does not explain how making a comment that he "seemed thinner" upon return from surgery is evidence of disability discrimination. Office Depot further argues that there was nothing unusual or discriminatory about asking for a sick note when Plaintiff was out of work for three days, and Plaintiff does not explain otherwise. Perry Decl. ¶ 6. Office Depot also points out that two other store managers in his district, Ms. Dewey and Mr. Stauffer, also suffered from serious health issues that impacted their ability to work, and that it is undisputed that Ms. Perry did not treat either of them differently or unfairly. Fukunaga Decl. Ex. J (Stauffer Depo.) at 35-36, 153-54; Dewey Decl. ¶¶ 4-5.

However, Plaintiff argues that Ms. Perry's "lifting" comments are evidence of disability discrimination because, while facially benign, they were made in a sarcastic manner. A dispute over how a remark should be interpreted based on conflicting testimony about the tone and manner of its delivery is generally a question for the jury, and for purposes of summary judgment the Court must look at the evidence in the light most favorable to Plaintiff. Moreover, especially given the pendency of Reid and the potentially- evolving California law on "stray remarks," the Court errs on the side of caution and denies summary judgment on this ground in conjunction with the others discussed 0herein.

### iii.    Good Faith Investigation

Plaintiff also argues that his termination was pretextual because Office Depot did not undertake a good faith investigation before his termination. He argues that M.C., M.T., M.V. and

United States District Court

For the Northern District of California

M.L. were all interviewed by Greg Lindo from Loss Prevention with Ms. Perry as a witness, while Mr. Lindo played no part in the investigation at his store. From this difference, Plaintiff concludes that in his case Office Depot did not conduct a "true" investigation but instead a "rubber stamp" investigation by Ms. Hale. However, he does not present evidence of any differences between investigations by Mr. Lindo and Ms. Hale, any reason why a decision was made not to involve Mr. Lindo, or how Mr. Lindo's lack of involvement in his investigation shows pretext. In contrast, Office Depot contends that Ms. Hale is a Senior HR Generalist who has been employed by Office Depot for 17 years, has received training in conducting investigations, and has conducted at least ten investigations. Therefore, this point does not aid Plaintiff in showing pretext.

### iv.    Plaintiff's Previous Payment of Meal Period Penalties

Plaintiff contends that he had previously paid at least 87 meal period penalties in 2007 and 14 in the four weeks leading up to the 2008 audit of his store. Impey Decl. ¶ 24. He reasons that, if he was trying to avoid meal period penalties, he would have edited more of those time cards to avoid penalties. However, as discussed above, this argument is irrelevant and speculative.

### v.    Plaintiff's Prior PIP

Plaintiff also argues that his earlier PIP for failure to ensure adequate weekend coverage was unwarranted, and that this is evidence of pretext. However, there is no evidence that the prior PIP played into the decision to terminate Plaintiff, so this is unhelpful to Plaintiff.

In sum, and for the reasons discussed above, even if none of the individual pieces of evidence are alone sufficient to show pretext, taken together they at least create a triable issue of fact that could refute Office Depot's claim that it had a good faith, honest belief in the reason for his termination. Defendant's motion is therefore DENIED.

## IV.    Failure to Prevent Discrimination

Plaintiff has also made a claim against Office Depot for failure to prevent discrimination and harassment under California Government Code § 12940(k), which states:

> It shall be an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California:
>
> ***

United States District Court
For the Northern District of California

> For an employer, labor organization, employment agency, apprenticeship training program, or any training program leading to employment, to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring.

This claim rises and falls along with Plaintiff's employment discrimination claim.  As discussed above, because Plaintiff's discrimination claim survives, summary judgment of the failure to prevent discrimination claim is DENIED.

## V.   Wrongful Termination

Plaintiff also makes a claim for wrongful termination in violation of public policy under California Government Code § 12940(a) and (k).  This claim also rises and falls along with Plaintiff's employment discrimination claim.  As discussed above, because Plaintiff's discrimination claim survives, summary judgment of the wrongful termination claim is also DENIED.

## VI.   Motions to Seal

Both parties have filed sealing requests for papers filed in connection with their summary judgment motions.  All of the documents that they seek to file under seal appear to be documents that were exchanged as "Confidential" under the parties' protective order.  Both parties stipulate to the other's requests to file the documents under seal.

However, neither party has specifically made a showing of compelling need to justify sealing the documents in connection with a summary judgment motion.  In fact, Defendant's request contains a typo so that it actually states: "The confidential nature of these documents does not overcome the right of the public to access the protected material."  There is a "strong presumption in favor of access" to Court files, especially those relating to case- dispositive motions and related documents, and a party seeking protection of such documents must present "compelling reasons sufficient to outweigh the public's interest in disclosure and justify sealing court records."  See Kamakana v. City and County of Honolulu, 447 F.3d 1172, 1179 (9th Cir. 2006).  The "compelling reasons" standard is invoked even if the dispositive motion, or its attachments, were previously filed under seal or protective order.  See Foltz .v State Farm Mut. Automobile Ins. Co., 331 F.3d 1122, 1136 (9th Cir. 2003) ("[T]he presumption of access is not rebutted where . . . documents subject to a protective order are filed under seal as attachments to a dispositive motion.  The . . . "compelling reasons" standard continues to apply.").  A "good cause" showing, without more, will not satisfy the

United States District Court
For the Northern District of California

"compelling reasons" test and documents and/or briefs that do not satisfy this test may accordingly be re- designated as public information upon proper request.  Id.

The parties are hereby Ordered to submit supplemental declarations explaining the compelling need for filing the documents in question under seal within ten days from the date of this Order.

**VII.    Defendant's Motion to Compel Rebuttal Deposition of Medical Expert**

On June 14, 2010, the Court issued an Order extending expert discovery dates to allow Defendant time to engage and prepare rebuttal expert reports, as well as additional time for discovery "should Plaintiff consent to submit to a psychiatric examination by Defendant's expert witness." Thereafter, Office Depot moved to compel an independent medical examination by its rebuttal expert and requested that the motion be heard on shortened time at the same time as the hearing on the Motion for Summary Judgment.

Plaintiff has disclosed Dr. Paul Berg, PhD. (a psychologist) as an expert, and timely submitted an initial expert report prepared by him after examination of Plaintiff over a two-day period.  See Fukunaga Decl. Exs. A, B.  Thereafter, Defendant requested that Plaintiff submit to an examination by Defendant's rebuttal expert psychiatrist, but Plaintiff refused on grounds that this examination is fact discovery and the fact discovery cutoff has passed.  Id., Ex. C; see also generally Plaintiff's Opp. Office Depot contends that there is good cause for ordering Plaintiff to allow a psychiatric examination by its rebuttal expert in order to evaluate the opinion of Plaintiff's designated psychological expert, and that Plaintiff has put his own mental status at issue by alleging that he suffered emotional distress.

**A.    Defendant's Motion Is Not Untimely**

Plaintiff opposes Defendant's motion primarily on the ground that the motion is untimely because Defendant did not diligently seek an IME of Plaintiff during the fact discovery period, which concluded more than two months ago.  Plaintiff contends that Defendant was on notice that he would be relying on expert testimony to support his emotional distress claims because this was disclosed in Plaintiff's September 3, 2009 initial disclosures.  See Sivarajah Decl. Ex. 1 at 6 ("Plaintiff also claims non-economic damages for things such as emotional distress, humiliation and embarrassment.  The extent of this emotional distress will be the subject of expert testimony and in am amount according to proof.")  Additionally, Plaintiff points to the discovery responses relied on by Defendant, in which

1   Plaintiff appears to have specified various physical ailments as a result of his alleged emotional

2   distress on October 19, 2010.  Plaintiff argues that, because Defendant was on notice of Plaintiff's

3   emotional distress claims and intention to use an expert to support them, it should have moved for an

4   IME pursuant to Rule 35 during fact discovery.  However, Plaintiff ignores the fact that the

5   examination by his expert took place *after* the fact discovery cutoff, and was very clearly treated as

6   an expert disclosure as opposed to fact discovery.  See Fukunaga Decl. Ex. A (disclosure of Dr.

7   Berg's report, exhibits in support, CV, list of testimony and fee information included in Plaintiff's

8   "Disclosure of Expert Reports and Information").

9        Plaintiff cites Miksis v. Howard, 106 F.3d 754, 758 (7th Cir. 1997), where the Seventh Circuit

10  rejected a personal injury defendant's challenge to the district court's denial of an IME after the

11  discovery cutoff.  The defendants argued that they had no reason to request a medical examination

12  until they received notice of plaintiff's proposed expert testimony regarding a prediction of medical

13  costs for the remainder of plaintiff's life.  Id. at 758.  The court held that the facts did not support this

14  argument because "Defendants knew from day one that plaintiff's medical condition was at issue"

15  and the need for medical expert testimony was "clearly foreseeable from the nature of plaintiff's

16  injuries."  Id.  The Seventh Circuit also found that defendants knew all along that they would not

17  receive plaintiff's proposed expert opinions until after the close of fact discovery and made a decision

18  to remain in ignorance.  Id. at 759.  In contrast, this is an employment discrimination case, not a

19  personal injury case, and the need for expert medical testimony is less foreseeable.

20       Even though Plaintiff's initial disclosures mention that he intended to show emotional distress

21  through expert testimony, it was not "clearly foreseeable" that Defendant would need an IME prior to

22  Plaintiff's disclosure of its expert report on the topic.  Therefore, the motion is not untimely.

23       **B.    Rule 35 IME Standard**

24       A party seeking to compel a psychiatric evaluation of an opposing party bears the burden of

25  affirmatively showing that the adverse party's mental or physical condition is in controversy and that

26  there is good cause for the examination.  See Fed. R. Civ. Proc. 35(a); Schlagenhauf v. Holder, 379

27  U.S. 104, 118 (1964) (stating that these two requirements - in controversy and good cause- cannot be

28  met "by mere conclusory allegations of the pleadings - nor by mere relevance to the case - but require

    an affirmative showing by the movant. . . .").  "Mental and physical examinations are only to be

ordered upon a discriminating application by the district judge of the limitations prescribed by the Rule." Schlagenhauf, 379 U.S. at 121. Rule 35 is to be liberally construed. See Schlagenhauf, 379 U.S. at 114-15 (stating generally that discovery rules should be "accorded a broad and liberal treatment"); Simpson v. Univ. Of Colorado, 220 F.R.D. 354, 362 (D. Colo. 2004) ("While Rule 35 should be construed liberally in favor of granting discovery, its application is left to the sound discretion of the court.").

### 1. In Controversy

Courts apply the factors set forth in Turner v. Imperial Stores, 161 F.R.D. 89, 95 (S.D. Cal. 1995) to determine if the "in controversy" prong is met:

> Most cases in which courts have ordered mental examinations pursuant to Rule 35(a) involve something more than just a claim of emotional distress. . . . [For example], courts will order plaintiffs to undergo mental examinations where the cases involve, in addition to a claim of emotional distress, one or more of the following: 1) a cause of action for intentional or negligent infliction of emotional distress; 2) an allegation of a specific mental or psychiatric injury or disorder; 3) a claim of unusually severe emotional distress; 4) plaintiff's offer of expert testimony to support a claim of emotional distress; and/or 5) plaintiff's concession that his or her mental condition is "in controversy" within the meaning of Rule 35(a).

Turner, 161 F.R.D. at 95.

Plaintiff has disclosed a psychologist, Dr. Berg, as an expert to support his claims. Further, he claims emotional distress based on depression, high blood pressure, anxiety, panic attacks, headaches, sleep disorder and weight loss. Fukunaga Decl. Ex. D at 11-12. Thus, Plaintiff's mental condition is in controversy for purposes of the IME.

### 2. Good Cause

Four factors are considered to determine good cause: "Factors that courts have considered include, but are not limited to, the possibility of obtaining desired information by other means, whether plaintiff plans to prove her claim through testimony of expert witnesses, whether the desired materials are relevant, and whether plaintiff is claiming ongoing emotional distress." Franco v. Boston Scientific Corp., 2006 WL 3065580 (N.D. Cal. Oct. 27, 2006). Here, Defendant has shown good cause for the IME because there appears to be no other means by which Defendant can obtain the information needed to rebut Plaintiff's expert testimony relating to his mental state without its own examination, and Plaintiff is admittedly claiming damage for emotional distress and he intends to prove it in part through expert testimony. See Roberson v. Bair, 242 F.R.D. 130, 137 (D.D.C.

United States District Court

For the Northern District of California

2007) (ordering IME by defense psychiatrist and psychotherapist experts over objections of employment discrimination plaintiff because "[w]ithout the information obtained through a court-ordered IME, defendant would have no means to rebut plaintiff's claims").

### 3.   Prejudice

Office Depot contends that Plaintiff will not suffer prejudice if the motion is granted because the examination will be completed, and the resulting report prepared, in enough time for Plaintiff to prepare for trial.  The Court has recently extended the expert discovery cutoff to August 6, 2010, and allowed Plaintiff to depose Office Depot's expert following the issuance of his report (which is to be prepared within 10 days of his examination).  Given that the cutoff for expert discovery is fast approaching, the Court hereby extends this cutoff solely as it relates to the IME for an additional two weeks, until August 20, 2010.  The parties are hereby Ordered to work together to find a mutually agreeable date for an IME as soon as possible.

For the foregoing reasons, Defendant's Motion to Compel an IME of Plaintiff by Defendant's Rebuttal Expert is GRANTED.

### 4.   Failure to Provide Information Required by Rule 35(a)(2)(B)

Plaintiff points out that Rule 35(a)(2)(B) requires that any order "specify the time, place, manner, conditions, and scope of the examination, as well as the person or persons who will perform it."  Defendant's motion does not include any of this required information.  Defendant is Ordered to issue a notice containing the information required by Rule 35(a)(2)(B) as soon as possible.  See Roberson, 242 F.R.D. at 138.

**IT IS SO ORDERED.**

Dated: July 27, 2010

_Elizabeth D. Laporte_

ELIZABETH D. LAPORTE
United States Magistrate Judge